[Civ. No. 44501. First Dist., Div. Two. Mar. 19, 1979.]

E. C. FULLERTON, as Director, etc., et al., Plaintiffs and Appellants, v. STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents.

**COUNSEL**

Evelle J. Younger and George Deukmejian, Attorneys General, R. H. Connett, Assistant Attorney General, and Denis D. Smaage, Deputy Attorney General, for Plaintiffs and Appellants.

P. A. Towner, Russell Kletzing and Marcia J. Steinberg as Amici Curiae on behalf of Plaintiffs and Appellants.

William R. Attwater, Gavin M. Craig, James T. Markle and Craig M. Wilson for Defendants and Respondents.

Kronick, Moskovitz, Tiedemann & Girard, Adolph Moskovitz, Clifford W. Schulz, Ronald A. Zumbrun, Raymond M. Momboisse, Elleene A. Kirkland, Thomas F. Olson and Jeanne M. Bauby as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

TAYLOR, P. J.—This is an appeal by the State Department of Fish and Game[1] (Department) from a judgment denying its petition for a writ of mandate to compel the State Water Resources Control Board (Board)[2] to issue a permit for the "in-stream" appropriation of water to provide minimum flow guarantees during low months to protect the state's beneficial interest in the fish resources of the Mattole River. The questions are whether: 1) physical control over the water is required for an "appropriation" of water; and 2) if not, whether the applicable constitutional and statutory provisions (mainly state Const., art. X, as adopted June 8, 1976; Wat. Code, § 1243, as amended by Stats. 1972, ch. 360), are ambiguous and if so, whether the matter is one for judicial determination or one that is exclusively within the prerogative of the Legislature, as indicated by its recent enactments. For the reasons set forth below, we have concluded that some minimal actual physical use of the water is still an element of the doctrine of appropriation in this state, and in any event, the Legislature has prescribed a statutory scheme for balancing the public interest in conservation and recreation and the public interest in other uses of water such as for irrigation and domestic purposes.

The basic facts are not in issue and may be summarized as follows: On January 16, 1976, the Department, pursuant to Water Code section 1252

---

[1]The Department is obligated to protect the fish and wildlife resources of the state (Fish & G. Code, §§ 1700, 5500 et seq.) which are the property of the people of the state (Fish & G. Code, § 1600), who have "the right to fish upon and from" the state's public lands and waters (state Const., art. I, § 25).

[2]The Board is charged with regulating the appropriation of the state's water resources under terms and conditions as in its judgment will best develop, conserve and utilize them in the public interest, pursuant to Water Code section 1252 et seq., set forth below at footnote 3, page 594. "All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law." (Wat. Code, § 102.) Water Code section 1225 provides: "Except as provided in Article 2.5 (commencing with Section 1226) of this chapter, no right to appropriate or use water subject to appropriation shall be initiated or acquired except upon compliance with the provisions of this division." Water Code section 1226 et seq. pertain to impoundment structures and are not pertinent here.

et seq., set forth below,[3] transmitted an application to appropriate water in the Mattole River and its tributaries for recreation and fish protection purposes. The Department's application did not seek a permit to divert water from the river or control the natural flow of water within the river. Rather, the Department sought to appropriate a minimum flow of 38,400 acre feet[4] which would remain in the river during the "low flow" months, May through October, for the benefit of the fish and to protect the right of the people to fish in the public waters of this state recognized by article I, section 25 of the state Constitution. The Board returned the application without acting upon it, and stated that while the objectives of the application were desirable, the Department had not sought an "appropriation" of water rights as that term has come to be defined in California's law of water rights, since it did not propose diversion or other physical control of the water. Thereafter, the Department filed and served

---

[3] The pertinent Water Code sections provide:

Section 1252: "*Any person may apply for and secure from the board,* in conformity with this part and in conformity with reasonable rules and regulations adopted from time to time by it, a permit for any unappropriated water." (Enacted 1943; Amend. Stats. 1957, ch. 1932, § 69.)

Section 1253: "*The board* shall allow the appropriation for beneficial purposes of unappropriated water *under such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest the water sought to be appropriated.*" (Enacted 1943; Amend. Stats. 1957, ch. 1932, § 70.)

Section 1254: "*In acting upon applications to appropriate water the board shall be guided by the policy that domestic use is the highest use and irrigation is the next highest use of water.*" (Enacted 1943; Amend. Stats. 1957, ch. 1932, § 71.)

Section 1255: "*The board shall reject an application when in its judgment the proposed appropriation would not best conserve the public interest.*" (Enacted 1943; Amend. Stats. 1957, ch. 1932, § 72.)

Section 1256: "*In determining public interest under Sections 1253* and 1255, the board shall give consideration to any general or co-ordinated plan looking *toward the control, protection, development,* utilization, and *conservation of the water resources of the State,* including The California Water Plan, prepared and published by the Department of Water Resources or any predecessor thereof and any modification thereto as may be adopted by the department or as may be adopted by the Legislature by concurrent resolution or by law." (Added Stats. 1957, First Ex. Sess. 1956, ch. 52, § 14; Amend. Stats. 1957, ch. 1932, § 72; Stats. 1959, ch. 2053, § 1.)

Section 1257: "In acting upon applications to appropriate water, *the board shall consider the relative benefit to be derived from (1) all beneficial uses of the water concerned including, but not limited to, use for domestic, irrigation, municipal, industrial, preservation and enhancement of fish and wildlife,* recreational, mining and power purposes, and any uses specified to be protected in any relevant water quality control plan, and (2) the reuse or reclamation of the water sought to be appropriated, as proposed by the applicant. The board may subject such appropriations to such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest, the water sought to be appropriated." (Added Stats. 1955, ch. 1015, § 1; Amend. Stats. 1957, ch. 1932, § 74, ch. 2082, § 1; Stats. 1959, ch. 2048, § 2; Stats. 1969, ch. 482, § 11, operative Jan. 1, 1970, ch. 1359, § 2, operative Jan. 1, 1970; Stats. 1970, ch. 157, § 1.) (All italics added.)

[4] The Department's request left available for future project development the remainder of the flow, about 909,000 acre feet.

the instant complaint for declaratory relief and, in the alternative, for a writ of mandate.[5]

The Board filed and served its answer which admitted that water may be appropriated without the prerequisite of a physical diversion, but denied that water may be appropriated in the manner proposed by the Department because it did not propose to exercise any kind of physical control of the water, but instead sought a right to require a certain amount of water to flow by natural means in the channel of Mattole River and its tributaries through lands that were not owned or controlled by the Department, or a right to "in-stream" appropriation.

The court concluded that: 1) while the use of water for recreation and for preservation of fish is a beneficial use of water, such a use is not in and of itself the sole criterion for a valid appropriation of water; the law of water rights in this state requires that an applicant for a permit to appropriate water must plan to exercise some physical control of the water sought to be appropriated; 2) the Board is the statewide agency responsible for administering and applying California law relating to surface water right appropriations and its long-standing determination that it lacks authority to grant applications for "in-stream" appropriative rights as no physical control is exercised, is reasonable. Accordingly, the court entered its order denying the Department's petition for a writ of mandate commanding the Board to entertain the application, as the Department's attempt at "in-stream" appropriation was not a valid "appropriation" of water, as that term has been construed in this state.

The parties agree that the applicable constitutional provision is silent on the precise issue here presented. Article X, section 2 of the state Constitution, as adopted June 8, 1976 (formerly art. XIV, § 3, as amended Nov. 5, 1974) provides: "It is hereby declared that because of the conditions prevailing in this State the *general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable,* and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. *The right to water or to the use or flow of water in or*

---

[5]The writ sought an order directing the Board to entertain the application; the complaint asked for a determination that water may be appropriated for the beneficial uses of protecting fishery resources without the requirement of constructing a physical diversion for the appropriated water.

*from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served,* and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that *nothing herein contained shall be construed* as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or *as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained"* (italics added).

The history of the above quoted constitutional provision indicates that its predecessor was adopted in 1928 in response to *Herminghaus* v. *South. California Edison Co.,* 200 Cal. 81 [252 P. 607], which held that a riparian owner was entitled to have the entire flow of a stream run past his property. The constitutional amendment was adopted to modify this holding and apply the doctrine of reasonable use to all water rights enjoyed or asserted in this state and every method of diversion (*People* ex rel. *State Water Resources Control Bd.* v. *Forni,* 54 Cal.App.3d 743, 749, 750 [126 Cal.Rptr. 851]; *Peabody* v. *City of Vallejo,* 2 Cal.2d 351, 367 [40 P.2d 486]; *Tulare Dist.* v. *Lindsay-Strathmore Dist.,* 3 Cal.2d 489, 524 [45 P.2d 972]; *Joslin* v. *Marin Mun. Water Dist.,* 67 Cal.2d 132, 138 [60 Cal.Rptr. 377, 429 P.2d 889]).

Although the state Constitution does not define the term "appropriator," the possessory nature of an appropriative water right has long been recognized.[6]

---

[6]As the Board's brief indicates, the doctrine first arose in California not as a creature of statute but by judicial recognition of a pattern of water use prevailing on the public domain at the time California was admitted to the Union. In *Irwin* v. *Phillips,* 5 Cal. 140, our Supreme Court validated the unwritten law of the mining camps of the Sierra Nevada: Priority of right to the use of water depended on when water was first diverted from the stream and applied to beneficial use. In their use of water, as well as their location on public lands, miners stood as mere trespassers tolerated by the state and federal governments (p. 146). Without any color of title to the lands they mined, prospectors diverting water on lands adjacent to the natural source could acquire no common law rights as riparian proprietors. Therefore, in the absence of objection by the true owner, the United States, those who built extensive diversion and conveyance works to transport water over great distances to the site of their diggings could rely on their

Thus, the present constitutional provision consists of a broad policy declaration that the waters of the state should be placed to beneficial use in reasonable and nonwasteful ways, and then in the last sentence clearly and expressly delegates to the Legislature the task of ascertaining how this constitutional goal should be carried out. ■ The Department's contention that the above provision, by itself, authorized in-stream appropriation, ignores the express language of the constitutional provision and particularly the last sentence. The Department's argument also ignores the large body of law pertaining to the acquisition of appropriative water rights which the Legislature has enacted in response to the constitutional provision.

After the California Legislature enacted statutes providing for the appropriation of public waters in 1872, our Supreme Court held in *Duckworth* v. *McKinley*, 158 Cal. 206, 211 [110 P. 927], and *Lower Tule River etc. Co.* v. *Angiola etc. Co.*, 149 Cal. 496, 499 [86 P. 1081], that the statutory method was not exclusive. It has been held that ". . . running

---

supply to the extent that their diversions predated other appropriations, even if these appropriators were located directly on the banks of the natural source (p. 147). Commenting on *Tartar* v. *Spring Creek Water and Mining Co.*, 5 Cal. 395, which announced this state's settled policy regarding recognition of rights, Justice Field said in *Basey* v. *Gallagher*, 87 U.S. (20 Wall. 670) 670 [22 L.Ed. 452]: "Ever since that decision it has been held generally throughout the Pacific States and Territories that the right to water by prior appropriation for any beneficial purpose is entitled to protection" (p. 683 [22 L.Ed. at p. 454]). Moreover, Justice Field unequivocally declared: "No distinction is made in those States and Territories by the custom of miners or settlers, or by the courts, in the rights of the first appropriator from the use made of the water, if the use be a beneficial one" (p. 682 [22 L.Ed. at p. 454]).

Commencing in 1866, the right to appropriate water on the public lands, customary in California from the time of the earliest settlements, was confirmed by Congress in three separate measures. The act of 1866, 14 Statutes at Large 253, section 9 (43 U.S.C. § 661), stated: ". . . whenever, by priority of *possession*, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the *possessors* and owners of such vested rights shall be maintained and protected in the same . . . ." (Italics added.)

The 1870 amendment of section 9 (16 Stat. 218) provided that all patents, preemptions, and homestead rights to federal lands should be subject to any water rights confirmed by the act of 1866. In the Desert Land Act of 1877 (19 Stat. 377, 43 U.S.C. § 321 et seq.), Congress again recognized prior appropriative rights to water on the lands to be disposed of by the act; in addition, the act provided that all surplus water on all public lands shall be held for appropriation and use of the public for irrigation, mining and manufacturing purposes. The United States Supreme Court interpreted this last provision in the Desert Land Act to sever forever any proprietary claims of the United States to waters upon all public lands settled under any federal land grant legislation (*Power Co.* v. *Cement Co.*, 295 U.S. 142 [79 L.Ed. 1356, 55 S.Ct. 725]). The deference of Congress to the state water law was recently reiterated in *California* v. *United States*, 438 U.S. 645 [57 L.Ed.2d 1018, 98 S. Ct. 2985], which affirmed a holding indicating that the federal government had to apply to the state for an appropriation permit.

water, so long as it continues to flow in its natural course, is not, and cannot be made the subject of private ownership. A right may be acquired to its use, which will be regarded and protected as property; but it has been distinctly declared in several cases that this right carries with it no specific property in the water itself" (*Kidd* v. *Laird,* 15 Cal. 161, 179-180; *Rancho Santa Margarita* v. *Vail,* 11 Cal.2d 501, 554 [81 P.2d 533]; *Big Rock M. W. Co.* v. *Valyermo Ranch Co.,* 78 Cal.App. 266 [248 P. 264]).

■ Although there is no private property right in the corpus of the water while flowing in the stream, the right to its use is classified as real property (*Locke* v. *Yorba Irrigation Co.,* 35 Cal.2d 205 [217 P.2d 425]; *Stanislaus Water Co.* v. *Bachman,* 152 Cal. 716 [93 P. 858]). The concept of an appropriative water right is a real property interest incidental and appurtenant to land (*Inyo Cons. Water Co.* v. *Jess,* 161 Cal. 516 [119 P. 934]; *Palmer etc.* v. *Railroad Commission,* 167 Cal. 163, 173 [138 P. 997]; *Silver Lake Power etc. Co.* v. *Los Angeles,* 176 Cal. 96, 101 [167 P. 697]; *Peake* v. *Harris,* 48 Cal.App. 363, 379-380 [192 P. 310]).

To constitute an appropriation, three elements must coexist, "*the intent to take, accompanied by some open, physical demonstration of the intent, and for some valuable use*" (*McDonald & Blackburn* v. *Bear River and Auburn Water and Mining Company,* 13 Cal. 220, 232-233; italics added). The outward manifestation of all three elements is most often evidenced by a diversion of the water from its natural source prior to the use (*Simons* v. *Inyo Cerro Gordo Co.,* 48 Cal.App. 524 [192 P. 144]). Other means of appropriation include watering liv stock directly from the source (*Steptoe Livestock Co.* v. *Gulley* 53 Nev. 163 [295 P. 772]) or by placing water wheels into a stream in order to use the flowage as power to operate a mill located on the bank (*Ortman* v. *Dixon,* 13 Cal. 33; *Tarter* v. *Spring Creek Water and Mining Co., supra,* 5 Cal. 395) and storage[7] of water in a reservoir (*Meridian, Ltd.* v. *San Francisco,* 13 Cal.2d 424 [90 P.2d 537, 91 P.2d 105]). The significant common element of all of these forms of possession is some physical act with respect to the water by the appropriator to manifest the possessory right.

■ The authorities in this state have uniformly defined the right to appropriative water as a possessory property right (*Kelly* v. *The Natoma Water Co.,* 6 Cal. 105; *Conger* v. *Weaver* (1856) 6 Cal. 548; *Cardoza* v.

---

[7]In 1969, the Legislature added section 1242.5 to the Water Code providing that the Board may approve appropriations by storage of water to be released for the purpose of protecting or enhancing the quality of other waters which are put to beneficial uses.

*Calkins* (1897) 117 Cal. 106, 112 [48 P. 1010]; *Utt* v. *Frey* (1895) 106 Cal. 392, 395 [39 P. 807]; *Haight* v. *Costanich* (1920) 184 Cal. 426, 430-431 [194 P. 26]; *De Necochea* v. *Curtis* (1889) 80 Cal. 397, 406 [20 P. 563, 22 P. 198]; *Antioch* v. *Williams Irr. Dist.* (1922) 188 Cal. 451, 463 [205 P. 688]). The possessory right entitles the owner to be protected in the quiet enjoyment of the use of water against a subsequent public land appropriator of the same water. Contrary to the Department's contentions, the Board acknowledges that while a physical diversion is not necessary in all cases, some element of possession or other control is essential. Ownership of land with the incidental right to control the water supplies the necessary possessory right to entitle the owner to apply for an appropriation of the water (see *Hunter* v. *United States,* 388 F.2d 148). By contrast, in the instant case, the Department had no possessory interest in either the water or the land through which the water flows.[8] The Department has not cited any authority which found a valid appropriation in the absence of some physical activity or possession of the land.

As indicated above, the California Legislature first enacted statutory procedures for obtaining appropriative water rights in 1872 (former Civ. Code, §§ 1410 to 1422). A claimant was required to post notice at the site of his proposed diversion, record his claim with the county recorder, begin developing his diversion within 60 days of his notice, and thereafter diligently prosecute his work to completion, i.e., by conducting water to the place of intended use. The provisions of the Civil Code confirmed the long existing requirement of the case law summarized above, that an appropriator must physically gain control of water and that one way of doing so was by separating it from the watercourse and conveying it to its place of use. The Civil Code procedure, however, was not exclusive as the courts continued to recognize completed appropriations of water made by actual diversion and use (*Wells* v. *Mantes,* 99 Cal. 583 [34 P. 324]; *Sierra Land etc. Co.* v. *Cain Irr. Co.,* 219 Cal. 82 [25 P.2d 223]).

█ In 1913, our Legislature enacted the Water Commission Act (Stats. 1913, ch. 586) which was codified in 1943 in division 2 of the Water Code. The statutory procedure is now the exclusive method of

---

[8] Contrary to the Department's contention, the Board's order No. WR 74-25 is also consistent with the above holdings that some physical act with respect to the water is necessary for a valid appropriation, whether called "possession," "taking" or "physical control." The order involved an applicant who proposed to make use of highwater runoff or overflows from watercourses for irrigation or stockwatering purposes. The Department's contention that *Warner Valley Stock Company* v. *Lynch* (1959) 215 Ore. 523 [336 P.2d 884]. and similar authorities did not involve an element of possession is incorrect. *Warner* held that such overflows are a type of natural diversion from the watercourse.

appropriating water in California (Wat. Code, § 1225; *Crane* v. *Stevinson,* 5 Cal.2d 387, 398 [54 P.2d 1100]). As indicated above, an appropriation is initiated by the filing of an application with the Board (Wat. Code, §§ 1250-1252.5), as the Department did in the instant case.

The Board concedes that like the state Constitution, the applicable provisions of the Water Code do not contain an express requirement of physical control. However, it contends that as the term "appropriation" was not defined in the code, the Legislature left unchanged the meaning of the term, as it had consistently developed, including its characterization as essentially a possessory right like other interests in real property. We agree.

Water Code sections 1243 and 1243.5, set forth below,[9] further the constitutional purposes of article X, section 2, discussed above at pages 596-597.

Thus, the Department is consulted before any new diversions of water are authorized by the Board. The Department has an opportunity to inform the Board of the amounts of water that are required both for preservation of an existing piscatorial use and for its enhancement. Whenever it is in the public interest, the Board must take those amounts into account whenever a permit to appropriate water is issued. Thus, the procedure outlined by Water Code sections 1243 and 1243.5 provides for

---

[9]Section 1243: "*The use of water for recreation and preservation and enhancement of fish and wildlife resources is a beneficial* use of water. In determining the amount of water available for appropriation for other beneficial uses, the board shall take into account, whenever it is in the public interest, the amounts of water required for recreation and the preservation and enhancement of fish and wildlife resources.

"The board shall notify the Department of Fish and Game of any application for a permit to appropriate water. The Department of Fish and Game shall recommend the amounts of water, if any, required for the preservation and enhancement of fish and wildlife resources and shall report its findings to the board.

"This section shall not be construed to affect riparian rights." (Italics added.)

Section 1243.5: "In determining the amount of water available for appropriation, the board shall take into account, whenever it is in the public interest, the amounts of water needed to remain in the source for protection of beneficial uses, including any uses specified to be protected in any relevant water quality control plan established pursuant to Division 7 (commencing with Section 13000) of this code.

"This section shall not be construed to affect riparian rights."

The Board here does not argue that the Department's proposed in-stream use is not a "beneficial" one within the meaning of the statutes; rather, it takes the position that there can be no appropriation for which it is required to issue a permit unless there · is man-made diversion, together with intent to apply water to beneficial use and actual application of the water to that beneficial use.

the balancing of competing beneficial uses of water which the Department maintains is lacking.[10]

The Department argues that the Board is attempting to enlarge the language of Water Code sections 1253 and 1375 by including a requirement of physical use or control of the water to be appropriated. The Department also relies on article I, section 25 of the state Constitution, set forth below, so far as pertinent,[11] and the specific provisions for the protection of fish (Fish & G. Code, § 5500 et seq.).[12] The Department urges that fish are a significant recreational and commercial resource which must be sustained.

As indicated above, the Board admits that its duties include the protection of fish, but rests on its long-standing construction of the Water Code provisions which require physical control either by artificial means (diversion or a storage structure) or establishment of a possessory right in the land to which the water is appurtenant. As is readily apparent from our above summary of the case law, the Board's interpretation[13] has followed the constitutional interpretations and the statutory scheme for appropriation in this state. Both have consistently contemplated physical diversion or possession of the appurtenant land. Significantly, our Legislature has not only failed to alter the basic system but has reaffirmed it in subsequent modifications of statutes dealing with appropriative

[10]We note that fish are also protected by Water Code section 1257 which directs the Board in acting upon applications to appropriate water to consider the relative benefit to be derived from all beneficial uses of the water concerned, including preservation and enhancement of fish and wildlife. The Board is authorized to subject such appropriations to such terms and conditions as in its judgment will best develop, conserve and utilize in the public interest the water sought to be appropriated. Any interested party has the right to protest against the approval of an application to appropriate water (Wat. Code, § 1330). Section 1330 allows the protest for reasons which may include adverse environmental impacts, such as reduction of flow below the minimum required for fish and wildlife preservation. Persons may also request the Board to notify them of proposed appropriations pertaining to any particular watercourse, county, or drainage basin (Wat. Code, § 1321). Through the protest procedure, any interested party can provide information regarding the maintenance of flows in watercourses.

[11]"The people shall have the right to fish upon and from the public lands of the State and in the waters thereof . . . ."

[12]A violation of any of these provisions is a misdemeanor (Fish & G. Code, § 12000).

[13]We note that the Board's interpretation is also consistent with the general rule in other Western states which use the doctrine of appropriation (1 Hutchins. Water Rights Laws in the Nineteen Western States (1971) p. 366; 1 Wiel, Water Rights in the Western States (3d ed. 1911) §§ 364-367; 2 Kinney, Irrigation and Water Rights (2d ed. 1912) pp. 1243-1244. We note that in 1973, Colorado enacted a statute that permits in-stream appropriation (Colo. Rev. Stat. Ann. § 37-92-102(3)) after its Supreme Court held that the law of appropriation provided no basis for in-stream appropriation in

water rights. ■ The readoption of a statutory provision amounts to ratification of the court's construction thereof (*Rosemary Properties, Inc. v. McColgan,* 29 Cal.2d 677 [177 P.2d 757]). Thus, where as here, a term contained in a statute has been construed by judicial decisions and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it (*Burt* v. *Scarborough,* 56 Cal.2d 817, 822 [17 Cal.Rptr. 146, 366 P.2d 498]; *People* v. *Hallner,* 43 Cal.2d 715, 719 [277 P.2d 393]).

■ The Legislature is presumed to have known of the judicial interpretations of the doctrine of appropriative water rights prior to its adoption of an exclusive statutory scheme dealing with this subject (2A Sutherland, Statutory Construction, §§ 50.01, 50.03; *Estate of Sloan,* 7 Cal.App.2d 319 [46 P.2d 1007]). As indicated above, the courts have consistently held that the 1913 statutory scheme was only a regulation of the existing privilege to appropriate water. "The present law was not enacted to abolish the right of appropriation of water. No attributes are added to constitute the right. The new legislation is designed 'merely to regulate and administer this privilege.'" (*Yuba River Power Co.* v. *Nevada Irr. Dist.,* 207 Cal. 521, 526 [279 P. 128]).

■ Further, and most important, here, as in *Rosemary, supra,* 29 Cal.2d 677, the Legislature has consistently refused to adopt legislation designed to overcome the effect of previous court decisions and most recently refused to do so in 1977.[14] Even assuming, without conceding, that we felt inclined to hold that no physical activity by the appropriator is required, the question is one for legislative rather than judicial determination.

---

*Colorado River W. Conserv. Dist.* v. *Rocky Mt. Pow. Co.* (1965) 158 Colo. 331 [406 P.2d 798]. Likewise, in Idaho, the 1975 Legislature authorized in-stream appropriation (Idaho Code, § 67-4307 (Supp. 1975)) enacted after *State, Dept. of Parks* v. *Idaho Dept. of Water Admin.* (1974) 96 Idaho 440 [530 P.2d 924] which held that by the 1971 legislation, the Idaho Legislature intended to dispense with the requirement of physical diversion. Two other states also recently reaffirmed the requirement of actual physical diversion (*State* ex rel. *Reynolds* v. *Miranda* (1972) 83 N.M. 443 [493 P.2d 409, 411]; *Sherlock* v. *Greaves* (1938) 106 Mont. 206 [76 P.2d 87, 90]).

[14]The proposed measure, Senate Bill No. 97, would have authorized the Department to file on behalf of the state an application with the Board to "reserve" unappropriated water for the preservation or enhancement of fish or wildlife so water then would not be available for appropriation for other purposes. The measure was defeated in the state Senate on June 20, 1977, by a vote of 25 to 11. In view of the recent drought and attention to the water problems of this state, as manifested by the Governor's Commission to Review California Water Rights Law, we can also assume that the 1977 Legislature was not unaware of the in-stream appropriation legislation recently enacted in other states and noted above at footnote 13. The Department's attempt to distinguish between the "in-stream" appropriation rights here sought and the "reserved rights" of Senate Bill No. 97 strikes us as ephemeral.

While we are aware of the Department's contentions that the present protest system (Wat. Code, § 1243) is inadequate, and that a need exists for a more expeditious system of protecting the piscatorial resources of this state, we are also aware of the recent recommendation of the Governor's Commission to Review California Water Rights Law.[15] However, as an intermediate appellate court, we are constrained from making a major change[16] in the long-standing water rights law of this state. We conclude, therefore, that the Board properly denied the Department's application for an in-stream appropriation permit. There is no support in the law of this state for the proposition that a minimum flow of water may be appropriated in a natural stream for piscatorial purposes without some physical act by the appropriator.

Our conclusion is also supported by the United States Supreme Court's recent decision in *United States* v. *New Mexico*, 438 U.S. 696, 704 [57 L.Ed.2d 1052, 1059, 98 S.Ct. 3012], where an in-stream flow of six cubic feet per second was being used for fish preservation purposes. The court rejected (438 U.S. at pp. 711-715 [57 L.Ed.2d at pp. 1064-1066]) an argument for an implied federal right to reserve water for recreation and wildlife preservation. The United States Supreme Court noted at page 715 [57 L.Ed.2d at page 1066] that such a reservation of water could mean a substantial loss in the amount of water available for irrigation and domestic uses. Similarly, the recognition of the Department's right of in-stream appropriation for piscatorial purposes could mean a substantial loss in the amount of water available for irrigation, domestic and all of the other uses that the Board must balance in the public interest.

In summary, to carry out the necessary balancing process, the statutes have provided the Board with maximum flexibility to consider the competing demands of flows for piscatorial purposes and diversions for agricultural, domestic, municipal or other uses. Pursuant to Water Code section 1243, the Board gives notice to the Department each time a diversion application is filed and the Department informs the Board as to

---

[15]Governor's Commission, Draft Report, August 1978, at pages 108-110, notes the need for a more comprehensive treatment of in-stream needs and intimates that the courts, would have to decide the issue of in-stream appropriation if the Legislature did not enact the comprehensive legislation recommended by the commission.

[16]We appreciate the quotation from our opinion in *Kriegler* v. *Eichler Homes, Inc.*, 269 Cal.App.2d 224, 227 [74 Cal.Rptr. 749], and noting our reference there to the need to reject "Ancient distinctions that make no sense in today's society . . . ." In *Kriegler*, however, we were merely expanding a growing body of product liability law, not introducing a new direction in an area of the law of real property rights in which the state Legislature has recently rejected a bill designed to achieve in-stream appropriation.

the minimum flows which it believes are required for fish. In addition, Water Code section 1330 allows any other person or group to protest the granting of an application to appropriate water for reasons which may include adverse environmental impacts, such as reduction of flows below the minimum required for fish and wildlife preservation. Further, pursuant to Water Code sections 1243.5, 1253, 1255 and 1257, the Board examines the use to which the applicant would place the water, the public interest of that use, the necessity of the proposed minimum fish flows, and the public interest in maintaining such flows, and finally it makes a decision, if there is a conflict among various uses, as to what the public interest requires in that particular situation.

The granting of in-stream appropriation rights to the Department for piscatorial purposes would tie up the minimum flow of 38,400 acre feet of the Mattole River in perpetuity. Thus, the legal recognition of in-stream appropriation rights would eliminate piscatorial purposes from the balancing processes prescribed by the Legislature. For instance, if a subsequent application were filed seeking some of the flow of the Mattole River for new and compelling uses, the Board may not be able to follow the procedures prescribed by Water Code section 1243 and balance the public interests as they appear at that time. A grant of prior in-stream appropriation rights to the Department could tie the Board's hands as to future uses. The water appropriated by the Department would be unavailable for other yet unforeseen and overriding uses.[17]

We recognize that, as the Department urges, the present protest procedure may be inadequate to protect the public fish and wildlife resources of this state. The recent drought, of which we may take judicial notice, is only an example of the many constantly changing and

---

[17]Arguably, the Board could require for in-stream appropriation permits a condition, pursuant to Water Code sections 1253 and 1254, that the piscatorial appropriation could not interfere with future appropriations of that flow for agricultural or municipal purposes similar to the conditional power appropriation permit upheld in *East Bay M. U. Dist.* v. *Dept. of P. Wks.*, 1 Cal.2d 476, 477-478 [35 P.2d 1027]. However, the inclusion of such a condition would be discretionary with the Board. In the absence of such a condition, the problem would remain and we do not think we can judicially mandate its uniform inclusion in the manner here suggested by the Department. Even assuming that we could and should do so, the result would be the same as is now the case under the present long-standing interpretation and administration of the law by the Board. The flow would remain in the stream unless and until an applicant for another use demonstrated the need for and the public interest in allowing appropriation of the flow for such other use. The Department would have gained nothing and the public would have needlessly lost the present system of balancing competing water demands and providing in-stream flow protection for fish when in the public interest.

unpredictable conditions in the context of which the competing beneficial uses of water must be balanced. However sympathetic we may be to the views of the Department and the fact that fish are not only a recreational resource but an important food and agricultural resource, we hold that the matter should be left to the Legislature.

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 12, 1979. Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.